USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 23, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                      :

ROSS H. MANDELL,               :

                    :       16 Civ. 1186 (PAC)

           *Petitioner*,    :       09 Cr. 662 (PAC)

                    :

     *-against-*         :      **OPINION & ORDER**

                    :

UNITED STATES OF AMERICA,    :

                    :

          *Respondent*.   :

                    :

-------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

On July 26, 2011, following a five-week trial, the jury convicted *pro se* petitioner Ross Mandell of (1) conspiracy to commit securities, wire, and mail fraud, (2) securities fraud, (3) wire fraud, and (4) mail fraud. He was sentenced to a term of 144 months in prison. The Second Circuit affirmed his conviction and sentence, *United States v. Mandell*, 752 F.3d 544 (2d Cir. 2014), and the Supreme Court denied certiorari, *Mandell v. United States*, 135 S. Ct. 1402 (2015).

Mandell now petitions, pursuant to 28 U.S.C. § 2255, for reversal of his conviction and vacation of his sentence. He argues that his trial attorney, Jeffrey Hoffman, suffered from an actual and potential conflict of interest because he simultaneously represented and had a close relationship with an unindicted coconspirator, and that Hoffman was ineffective because he did not file an interlocutory appeal after the Court denied Mandell's motion to dismiss.

Mandell does not plausibly establish either a lapse in Hoffman's representation, or that Hoffman's representation was objectively unreasonable and that Mandell was prejudiced as a result. The Court therefore denies Mandell's Petition.

1

**BACKGROUND**

## I.      Relevant Procedural History

In June 2009, a grand jury indicted Mandell along with five co-defendants, Stephen Shea, Adam Harrington, Arn Wilson, Robert Grabowski, and Michael Passaro.  *See* Dkt. 2.[1]  On December 14, 2010, a superseding indictment charged Mandell with four crimes: (1) conspiracy to commit securities, wire, and mail fraud, (2) securities fraud, (3) wire fraud, and (4) mail fraud. Dkt. 96.

On December 2, 2010, Mandell moved to dismiss the securities fraud and conspiracy to commit securities fraud charges based on the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  Dkt. 91.  Mandell argued that *Morrison* precluded the extraterritorial application of the anti-fraud provisions of the Securities Exchange Act. According to Mandell, because the conduct alleged in the indictment related to securities sales that occurred outside of the United States and not on an American exchange, dismissal of the securities fraud and conspiracy to commit securities fraud charges was required.  The Court denied Mandell's motion on March 16, 2011.  Dkt. 115.

Between January 25, 2011 and February 14, 2011, defendants Grabowski, Passaro, Wilson, and Shea pleaded guilty to certain counts in the superseding indictment.  The remaining two defendants, Mandell and Harrington, did not plead guilty, and instead proceeded to trial. Trial commenced on June 20, 2011, and concluded on July 26, 2011, when the jury found Mandell and Harrington guilty of all charges against them.

Following their convictions, Mandell and Harrington moved pursuant to Fed. R. Crim. P. 29 for a judgment of acquittal and alternatively pursuant to Fed. R. Crim. P. 33 for a new trial.

---

[1] Docket citations, unless otherwise specified, are to *United States v. Mandell*, 09 Cr. 662 (PAC) (S.D.N.Y.).

2

Dkt. 161, 163. They contended, among other things, that the government failed to prove intent to engage in a scheme to defraud, intentionally false or fraudulent representations, or fraudulent domestic securities transactions within the applicable limitations period. The Court denied their motions on November 2, 2011. Dkt. 173. On May 3, 2012, the Court sentenced Mandell to a total term of 144 months of imprisonment. *See* Dkt. 204. The Court also ordered Mandell to make forfeiture of $50 million, pay a fine of $10,000, and pay a mandatory special assessment of $400. *Id.*

Mandell appealed his judgment of conviction and sentence on May 10, 2012. Dkt. 208. He challenged, among other things, his securities fraud conviction based on the Supreme Court's decision in *Morrison*. *See United States v. Mandell*, 752 F.3d 544 (2d Cir. 2014). The Second Circuit rejected Mandell's argument, and on May 16, 2014, affirmed Mandell's conviction and sentence.[2] *Id.* On February 23, 2015, the Supreme Court denied certiorari. *Mandell v. United States*, 135 S. Ct. 1402 (2015).

## II. Summary of Trial

Over the course of a five-week trial, the government introduced evidence that Mandell and Harrington were guilty of conspiracy to commit securities, wire, and mail fraud; and substantive counts of securities, wire, and mail fraud. The trial involved more than twenty witnesses, hundreds of exhibits, and a transcript spanning nearly 4,000 pages.

### A. The Government's Case

The substance of the government's case against Mandell was that Mandell used two Wall Street brokerage firms, the Thornwater Company ("Thornwater") and Sky Capital, LLC ("Sky

---

[2] Mandell also argued on appeal that his co-defendants should have been made jointly and severally liable for forfeiture. The government conceded error, and the Second Circuit vacated and remanded as to that sole issue. On May 22, 2014, the Court issued an amended forfeiture order. Dkt. 258.

Capital"), to defraud foreign and domestic investors out of millions of dollars. The evidence showed that the scheme started in 1998 with Thornwater. Grabowski wanted to start his own brokerage firm. Mandell helped Grabowski do so, and Grabowski was eventually installed as president of Thornwater. Grabowski testified, however, that Mandell, despite having no documented ownership interest in or power to have control over Thornwater, ran the show from behind the curtain. For instance, Mandell controlled who was hired and fired; the spending of funds; and what private placements to offer to investors. Mandell also directed brokers on how to pitch several private placements that purportedly would bring certain companies public, instructing the brokers to lie about the potential risks and rewards associated with the investments. The Thornwater brokers lied about the certainty that the companies would go public; the returns the investors would earn; and the way the investors' money would be spent.

Around 2000-2001, Mandell decided that he wanted to open a new brokerage firm that would appear unrelated to Thornwater. Thornwater was running out of cash, and investor complaints were steadily increasing. But even as Mandell was purportedly separating from Thornwater, he continued to exercise control from behind the scenes. He resigned from Thornwater on or about January 30, 2001, and entered into a sweetheart deal to extract tens of thousands of dollars from Thornwater. He moved across the street from Thornwater, opened Sky Capital, and started hiring Thornwater brokers to work at Sky Capital. He also continued to use Thornwater to raise money through a private placement called Dorchester Holdings. Dorchester Holdings served to keep Thornwater open while money was being raised for Sky Capital to get off the ground.

In June 2002, Sky Capital offered stock in the initial public offering ("IPO") of an affiliated company, Sky Capital Holdings Ltd. ("Sky Capital Holdings"). Sky Capital Holdings

was listed on the Alternative Investment Market ("AIM") in London, a smaller market of the London Stock Exchange. Sky Capital represented that a British brokerage firm would handle the initial placement of stocks, but Mandell and Harrington used their own brokers from Thornwater to sell the shares in London. Then, because investor money went to the British brokerage firm, the Thornwater brokers were paid commissions out of the Dorchester Holdings bank account. In March 2004, another related company, Sky Capital Enterprises, was also listed on the AIM.

With stock trading on the AIM, the scope of the fraud scheme expanded. In order to entice investors to part with their money, the brokers offered investors the chance to purchase the publicly traded Sky Capital stock at a "discount" through private stock offerings. They had to artificially prop up the stock price of the shares on the AIM in order for the investors to feel that they were getting a bargain. The brokers crossed stock trades, operated under a no net sales policy, and received undisclosed commissions (really bribes) as a reward for perpetuating the scheme. The evidence showed that Mandell was aware of the market manipulation, and why the market was being manipulated. Additionally, investors were told, at Mandell's direction, that there was a big liquidity event just around the corner; but of course, no liquidity event occurred.

### B.    Mandell's Case

At trial, Mandell argued that the government failed to meet its burden of proving his guilt beyond a reasonable doubt. His attacks focused on the (supposed) lack of evidence of his control at both Thornwater and Sky Capital. He stressed that Grabowski controlled and was the owner of Thornwater, not Mandell; that Grabowski had the authority at Thornwater to disburse money, not Mandell; that Grabowski's name was on Thornwater documents filed with the Federal Trade Commission and the National Association of Securities Dealers ("NASD"), not Mandell's; and that Grabowski had the power to fire Mandell. Mandell was just a broker at Thornwater looking

to represent his clients, not some puppet master operating in the shadows. In other words, Grabowski's testimony was all a lie. At Sky Capital, Mandell highlighted that he was not the president; that he could not and did not run the company; and that there was a legitimate board of directors that made decisions relating to Sky Capital.

With respect to the brokers' pitches, Mandell argued that the brokers chose to lie to investors and potential investors on their own, and now that they had been caught, they sought to make Mandell the fall guy. They lied at trial about Mandell's involvement in order to provide substantial assistance to the government so they could get the benefit of their cooperation agreements and potentially lower sentences. And the investors who took the stand and explained how they were defrauded were all in fact sophisticated and understood the risks associated with their investments. Mandell claimed that he played by the rules. He spent millions on lawyers to ensure that his actions did not violate any laws, and that was why, for example, the private placements were accompanied by memoranda that identified risks associated with the investments. He successfully brought two companies public on the AIM, and certain investors in fact were able to make money.

The jury rejected Mandell's defense. On July 26, 2011, after two and a half days of deliberation, the jury found Mandell guilty of all four counts against him. As the Court explained in considering Mandell and Harrington's Rule 29 and Rule 33 motions, "the jury's verdict was based on overwhelming evidence that defendants had defrauded investors and enriched themselves at the investors' expense." Dkt. 173 at 6.

### C. Altman's Role

Steven Altman was an uncharged participant in the criminal scheme. He did not testify, but his role was discussed throughout the trial. Altman was a close friend of Mandell, and was

6

an attorney for both Thornwater and Sky Capital. Altman, his firm, Ziegler, Ziegler and Altman ("ZZA"), and his partner Steve Ziegler were involved in several of the Thornwater private placements. Ziegler or Altman would help set up the private placements, and investors would wire money into a ZZA escrow account. Altman also coached employees to lie under oath to the NASD and state that Grabowski—not Mandell—controlled Thornwater. Additionally, Altman dealt with disgruntled investors and offered them deals that were less favorable than what the investors were originally promised in order to keep them from complaining. Altman directed at least one broker to sign a promissory note that served to conceal that the broker was receiving undisclosed commissions. Finally, Altman told at least one broker that crossing stocks was legal and proper and that Sky Capital's conduct was consistent with industry rules and regulations.

## III.    Habeas Petition

On February 11, 2016, Mandell filed his § 2255 Petition. He contends that his Sixth Amendment right to conflict-free counsel was violated because Hoffman's loyalties were divided between Mandell and Altman. Mandell asserts that while Hoffman was representing Mandell, Hoffman and Altman had a very close relationship: Altman referred at least two high-paying clients to Hoffman, including Mandell; Hoffman and Altman shared office space; and Hoffman and Altman had a father/son relationship. Mandell also asserts that he learned after trial that Hoffman had been simultaneously representing Altman in connection with a Securities and Exchange Commission ("SEC") proceeding.[3] That proceeding, however, had nothing to do with any of the facts at issue in Mandell's case. Rather, it dealt with Altman's conduct as a lawyer for a friend who had been discharged by a company she worked for.

---

[3] The Court has found no record references and does not recall being aware, prior to Mandell's Petition, of Hoffman's simultaneous representation of Altman and Mandell.

On November 10, 2010, the SEC found that Altman had offered to have one of his clients "evade the [Division of Enforcement's] service of a subpoena and/or testify falsely in exchange for a financial package from two respondents in the proceeding." *In re Steven Altman, Esq.*, Release No. 63306, 2010 WL 5092725, at *1 (Nov. 10, 2010). Consequently, the SEC permanently denied Altman the right to practice or appear before it. *See id.* Hoffman represented Altman during the SEC proceeding, including before the Administrative Law Judge, as well as in an action Altman later filed against the SEC. *See id.*; Affidavit of Jeffrey C. Hoffman, Esq. ("Hoffman Aff."), Dkt. 326, ¶ 3; *Altman v. S.E.C.*, 10 Civ. 9141 (RJH) (S.D.N.Y.). On December 7, 2010, Altman brought an action against the SEC in the Southern District of New York for declaratory and preliminary and permanent injunctive relief ("Altman Action"). *Altman v. S.E.C.*, 10 Civ. 9141 (RJH), Dkt. 1 (S.D.N.Y.). Altman argued that the SEC lacked the power to discipline lawyers appearing before it and requested, among other things, that the SEC's November 10, 2010 order against him be vacated. *Id.* United States District Judge Richard J. Holwell dismissed the action for lack of jurisdiction on March 8, 2011, *id.*, Dkt. 15, and the Second Circuit affirmed on June 12, 2012, *id.*, Dkt. 19. Altman also petitioned the D.C. Circuit to review the SEC's order, but did so *pro se*. The court denied the petition. *Altman v. S.E.C.*, 666 F.3d 1322, 1324 (D.C. Cir. 2011).

This is not really a conflict in which counsel appears in the same case on behalf of multiple parties with different interests. Nonetheless, Mandell claims that because of Hoffman's divided loyalties, Hoffman chose to shield Altman from potential liability to Mandell's detriment. Mandell catalogs a laundry list of events that should have happened; and "if only" they did, Mandell would have not been convicted. Specifically, Hoffman should have allowed Mandell to testify at trial and meet with the government, proffer, cooperate, or plead guilty;

Hoffman should have called Altman and others as witnesses; and Hoffman should have more vigorously cross-examined government witnesses about Altman's role in the scheme. Many of the arguments are contradictory and fanciful. Altman, for example, would exonerate Mandell by inculpating himself; and Mandell would proffer or cooperate, but would not admit guilt. Additionally, Mandell asserts that Hoffman was ineffective because he did not file an interlocutory appeal after the Court ruled on Mandell's motion to dismiss pursuant to the Supreme Court's decision in *Morrison*. This argument is dismissed out of hand because it was raised on appeal and rejected by the Second Circuit. It does not fare better in the § 2255 Petition.

On February 23, 2016, the Court ordered the government to respond to Mandell's Petition. Dkt. 318. On June 2, 2016, the government requested that the Court enter an order that Hoffman submit an affidavit or affirmation addressing Mandell's assertions and send Mandell an informed consent form waiving the attorney-client privilege. 16 Civ. 1186 (S.D.N.Y.), Dkt. 9. On June 7, 2016, the Court entered the order. Dkt. 321. Mandell's signed attorney-client privilege waiver was filed on the docket on July 8, 2016. Dkt. 322. On July 25 and July 26, 2016 respectively, the Government filed its opposition to Mandell's Petition and Hoffman's affidavit addressing the claims in Mandell's Petition. Dkt. 324, 325, 326. On September 23, 2016, Mandell's reply, including his affidavit ("Mandell Aff."), was filed on the docket. Dkt. 329, 329-2.

On October 20, 2016, the government filed a letter requesting that the Court consider an e-mail chain in reviewing Mandell's Petition. 16 Civ. 1186 (S.D.N.Y.), Dkt. 15, refiled as Dkt. 18. The e-mail chain includes e-mails between Altman and Mandell from December 7, 2010. 16 Civ. 1186 (S.D.N.Y.), Dkt. 18-1. In the first e-mail, Altman appears to have attached a document filed in the Altman Action before United States District Judge Holwell (*see* page 8,

*supra*). Altman states: "The attached was filed today. You may find it interesting. It is the work of my good friend Mitch Stein and I though Jeff [Hoffman] remains involved for good order." *Id.* at 2. Mandell responds: "Congratulations! I will read through it tonight!" *Id.* Altman replies: "Argument on our motion for a stay/TRO/etc tomorrow at noon. Prayers welcome!" *Id.* And Mandell then says: "I'll pray hard!" *Id.* The government contends that this shows that Mandell was aware of Hoffman's involvement in representing Altman in connection with the SEC proceeding. 16 Civ. 1186 (S.D.N.Y.), Dkt. 18. Mandell objects to the Court considering the e-mails. *See* Dkt. 330. Given the close relationship between Mandell and Altman in business over an extended period of time, it is almost inconceivable that Mandell was not aware of Altman's SEC proceeding and Hoffman's role as counsel. The e-mail chain confirms what appears to be obvious.

## DISCUSSION

### I. Legal Standards

#### A. Ineffective Assistance of Counsel

A defendant claiming ineffective assistance of counsel in violation of the Sixth Amendment must show that (1) "counsel's representation fell below an objective standard of reasonableness;" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Wash.*, 466 U.S. 668, 688, 694 (1984). Failure to make either of the two required showings is fatal to a claim of ineffective assistance of counsel. *See id.* at 700.

With respect to the first required showing, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.* at 689. "Judicial scrutiny of counsel's performance must be highly deferential . . . ." *Id.* And

the "court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

With respect to the second required showing, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

## B.     Conflict of Interest

"A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." *LoCascio v. United States*, 395 F.3d 51, 56 (2d Cir. 2005). The Second Circuit has identified three types of attorney conflicts of interest: *per se*, actual, and potential. *Ventry v. United States*, 539 F.3d 102, 111 (2d Cir. 2008).

"[A] *per se* conflict of interest requires automatic reversal without a showing of prejudice." *United States v. Williams*, 372 F.3d 96, 103 (2d Cir. 2004) (internal quotation marks omitted). The Second Circuit has found *per se* conflicts of interest "[1] where trial counsel is not authorized to practice law and [2] where trial counsel is implicated in the same or closely related criminal conduct for which the defendant is on trial." *Id.* (internal quotation marks omitted). A *per se* conflict does not exist here.

"[A]n actual conflict of interest occurs when the interests of a defendant and his attorney diverge with respect to a material factual or legal issue or to a course of action." *Id.* at 102 (internal quotation marks and emphasis omitted). Prejudice is usually presumed, but the defendant still must establish that the "conflict adversely affected his lawyer's performance." *United States v. Feyrer*, 333 F.3d 110, 116 (2d Cir. 2003). The conflict must result in a "lapse in representation," *i.e.*, "[1] that some plausible alternative defense strategy or tactic might have

been pursued, and [2] that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Williams*, 372 F.3d at 106. "With respect to the substance of the plausible alternative strategy, the defendant need not show that the defense would necessarily have been successful had it been used, only that it possessed sufficient substance to be a viable alternative." *Feyrer*, 333 F.3d at 116. Moreover, "[t]he term 'plausible alternative defense strategy' does not embrace all possible courses of action open to a defense attorney; it refers to those which a zealous advocate would reasonably pursue under the circumstances." *Lopez v. Scully*, 58 F.3d 38, 42 (2d Cir. 1995).

"Potential conflicts exist if the interests of the defendant may place the attorney under inconsistent duties at some time in the future and violate the Sixth Amendment when they prejudice the defendant." *Ventry*, 539 F.3d at 111 (internal quotation marks, citations, and alteration omitted). "In order to prevail on such a claim, the petitioner must establish both that counsel's conduct fell below an objective standard of reasonableness and that but for this deficient conduct," there is a reasonable probability that "the result of the trial would have been different, under the familiar standard established by *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984)." *See Armienti v. United States*, 234 F.3d 820, 824 (2d Cir. 2000); *see also United States v. Fulton*, 5 F.3d 605, 609 (2d Cir. 1993).

### C.      Evidentiary Hearing

Section 2255 provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. 2255(b). If, however, "it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to

relief, the judge must dismiss the motion." *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (quoting Rules Governing § 2255 Proceedings for the United States District Courts, Rule 4(b)).

"To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief." *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013). The defendant "need establish only that he has a 'plausible' claim of ineffective assistance of counsel, not that he will necessarily succeed on the claim." *Raysor v. United States*, 647 F.3d 491, 494 (2d Cir. 2011) (quoting *Puglisi*, 586 F.3d at 213). A hearing is not required, however, "where the allegations are vague, conclusory, or palpably incredible." *See Gonzalez*, 722 F.3d at 130 (internal quotation marks omitted). And "a district court need not assume the credibility of factual assertions, as it would in civil cases, where the assertions are contradicted by the record in the underlying proceeding." *Puglisi*, 586 F.3d at 214.

### D.     *Pro Se* Submissions

Because Mandell is *pro se*, his submissions are "held to less stringent standards than formal pleadings drafted by lawyers." *See Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993) (internal citation omitted). The Court reads Mandell's submissions "liberally, and . . . interpret[s] them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

## II.     Ineffective Assistance of Counsel – Failure to File an Interlocutory Appeal

The Court must reject Mandell's argument that Hoffman's "representation fell below an objective standard of reasonableness" because he failed to file an interlocutory appeal challenging the Court's denial of Mandell's motion to dismiss based on the Supreme Court's

decision in *Morrison*.[4]  *See Strickland*, 466 U.S. at 688.  Interlocutory appeals are very rare because Courts of Appeals generally only have jurisdiction over "final decisions."  *See* 28 U.S.C. § 1291.  In criminal cases, the Second Circuit has explained that it "ordinarily lack[s] jurisdiction to review decisions made before sentencing is complete and a judgment of conviction has been entered."  *United States v. Robinson*, 473 F.3d 487, 490 (2d Cir. 2007).  And "the final judgment rule is at its strongest" in criminal cases.  *Id.*

Non-final decisions may be appealed under the "collateral order" doctrine, which permits review of "a preliminary or interim decision . . . when it (1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a judgment."  *Id.*  However, "the Supreme Court has interpreted the collateral order doctrine '"with the utmost strictness" in criminal cases,' and has narrowly limited its application in such cases."  *Id.* (quoting *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989) and "noting that the Court has 'found denials of only three types of motions to be immediately appealable:  motions to reduce bail, motions to dismiss on double jeopardy grounds, and motions to dismiss under the Speech or Debate Clause.'").

There is simply no reason to think that the Second Circuit would have entertained an interlocutory appeal of the Court's decision on Mandell's motion to dismiss.  Because the appeal would have been futile, the decision not to file it cannot be considered unreasonable.[5]  *See*

---

[4] Additionally, Mandell appears to argue Hoffman was ineffective for failing to move the Court pursuant to 28 U.S.C. § 1292(b) for certification of an order for interlocutory appeal.  *See* Petition at 11–12.  However, 28 U.S.C. § 1292(b) "does not apply in criminal cases."  *See United States v. Selby*, 476 F.2d 965, 967 (2d Cir. 1973); 28 U.S.C. § 1292(b) ("When a district judge, in making in a *civil action* an order not otherwise appealable under this section . . . ." (emphasis added)).

[5] Mandell has also failed to show prejudice given that the Second Circuit did not dismiss any counts in the Indictment on appeal, and given that there is no basis to conclude that there is a reasonable probability that evidence of foreign securities transactions would have been excluded from trial.  *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) ("[E]vidence of uncharged criminal activity is not considered other crimes evidence under Fed. R.

*Maldonado v. Burge*, 697 F. Supp. 2d 516, 541 (S.D.N.Y. 2010) ("The failure to make demonstrably futile arguments cannot constitute constitutionally ineffective assistance of counsel.").

## III.     Actual Conflict of Interest

Mandell claims that Hoffman had an actual conflict of interest because of his relationship with Altman. According to Mandell, Hoffman's conflict resulted in several lapses in representation: Hoffman did not call Mandell, Altman, or certain other witnesses to testify at trial; Hoffman did not vigorously cross-examine witnesses about Altman's involvement in the scheme; and Hoffman did not allow Mandell to meet with the government, proffer, cooperate, or plead guilty.

It is doubtful that there is any actual conflict here. Altman was not a named party, and Hoffman did not represent Altman in any action which could be called "related" to the criminal indictment. Nonetheless, for purposes of ruling on Mandell's § 2255 Petition, the Court will assume that Hoffman's loyalties were divided between Mandell and Altman, and that Mandell did not waive the conflict of interest, even though it is obvious that Mandell was fully cognizant of Altman and Hoffman's relationship. *See United States v. Schwarz,* 283 F.3d 76, 95 (2d Cir. 2002) ("In most cases where a defendant is faced with a situation in which his attorney has an actual or potential conflict of interest, it is possible for him to waive his right to conflict-free counsel in order to retain the attorney of his choice."); *see also United States v. Blau*, 159 F.3d 68, 74–75 (2d Cir. 1998). Still, Mandell's Petition is meritless. He makes his claims with the precision of a blunderbuss, his arguments a scattered outburst of conflicting and contradictory

---

Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.").

assertions that do not, viewed either individually or collectively, indicate a lapse in representation resulting from Hoffman's supposed conflict.

### A.    Hoffman Does Not Cross-Examine Witnesses About Altman's Role in the Scheme

Mandell articulates no plausible defense strategy involving cross-examining witnesses about Altman's role in the scheme.  Perhaps Mandell wanted to place the criminal blame on Altman, and so he argues that ZZA owned 9.9% of the General Partner that owned and controlled Thornwater; Altman was counsel to Thornwater and various holdings companies; Altman was listed as counsel in every private placement memorandum; and Altman was the escrow agent for every private placement.  *See* Reply at 25.  This, Mandell asserts, meant that Altman could "control the flow of client invested funds," and therefore "exercise control over Grabowski."  *Id.*  Further, Altman allegedly owned and controlled founders' shares blocks in Thornwater private placements, and was the "architect" of the Thornwater holdings companies and private placements.  *Id.* at 25–26.

But so what?  This evidence does not in any way undermine or rebut the government's overwhelming evidence that Mandell orchestrated the many lies that were told to investors at both Thornwater and Sky Capital.  Mandell says that Altman could exercise control over Grabowski (whatever that means), but he does not say Altman did so or why this allegation would be relevant to his defense.  Mandell makes no claim that Altman really was the mastermind behind the scheme, or that he concocted or directed the falsehoods that the brokers told investors.  Furthermore, an attack on Altman might upset the theory of defense that was used at trial:  Mandell spent millions on lawyers to ensure that business was transacted legally.

Instead, the factual assertions Mandell argues are supposedly relevant simply support what was already presented to the jury:  Altman was a participant in the scheme and worked for

its success.  And in any event, many of Mandell's factual assertions were in fact brought out at trial.  *See, e.g.*, Trial Tr. 389–90, 414 (explaining that money for private placements would be wired into ZZA escrow account); Trial Tr. 429–30 (explaining that either owner of Lisa's Incredible Edibles owed Altman money, or Altman put money into the company); Trial Tr. 485 (explaining that Altman was lawyer for Thornwater and Sky Capital).  The factual assertions about Altman are not at all inconsistent with, and do not call into question, the government's theory of the case against Mandell.  The Court does not see how these factual allegations would have been helpful to his defense.

Moreover, Hoffman's detailed cross-examination of witnesses belies Mandell's claim that Hoffman shied away from questioning witnesses about Altman.  In fact, Hoffman asked two witnesses whether Altman committed crimes with them.  *See* Trial Tr. 565–66, 2641–42.  This does not in any way suggest that Hoffman sought to protect Altman to Mandell's detriment.  Mandell consequently fails to establish a plausible claim there was a lapse in Hoffman's representation based on his decision not to cross-examine witnesses more aggressively about Altman's role in the scheme.

### B.      Hoffman Does Not Call Altman at Trial

Mandell fails to plausibly explain how Hoffman's decision not to call Altman as a witness amounts to a lapse in representation.  He states that "Grabowski and Altman had their own agenda (Altman needed Grabowski to hide the fact of his own involvement, not Mandell's) and probably still does [*sic*] to this day," and that "[i]f Altman had testified, he could tell the truth to these facts and corroborate Mandell's testimony."  Reply at 32.  Hoffman was to get Altman's corroboration of Mandell's position; but also had to attack Altman's credibility.  An impossible task.

The innuendo here is that but for Hoffman's divided loyalties, Hoffman could have elicited testimony from Altman exonerating Mandell at Altman's expense. This is not an argument, as much as it is a wish. As discussed above, Mandell offers nothing to suggest that Altman was really in charge and responsible for the lies told to unwitting investors. In the absence of factual allegations suggesting that liability could have shifted from Mandell to Altman, the Court fails to see what plausible alternative defense strategy would have included Mandell's defense counsel gratuitously highlighting Altman's alleged bad acts to the jury. This is especially true as Mandell argues that Altman's testimony could have been used to corroborate his own testimony; stressing Altman's alleged bad acts would have undercut Altman's credibility, discounting any corroborative value his testimony may have had. Further, there is no indication that Altman would have waived his Fifth Amendment privilege against self-incrimination in responding to questions about crimes he may have committed. *See Eisemann v. Herbert*, 401 F.3d 102, 109 (2d Cir. 2005) ("Moreover, if questioned about his culpability for Robert's alleged offenses, Henry would have had the protection of the privilege against self-incrimination, and nothing in the record suggests that he was willing to waive his privilege."). As a result, Mandell has not established a plausible claim that calling Altman to testify was "inherently in conflict with or not undertaken due to [Hoffman's] other loyalties or interests." *Williams*, 372 F.3d at 106.

### C. Hoffman Does Not Call Other Witnesses at Trial

Mandell argues that Hoffman's decision to not call several witnesses was a lapse in representation. One investor, Raymond Knox, who purportedly lost over $500,000, said he was still willing to testify in Mandell's favor. *See* Dkt. 329-3. Knox claims that he told Hoffman about Altman's involvement: Knox sent funds to the ZZA escrow account; Altman, through

ZZA, "structured all the private placement offerings and directed all the monies;" Altman was a part owner of Thornwater "and was to oversee and help Grabowski in the operation of the firm;" ZZA's name appears in all of the Thornwater private placement memoranda "as counsel and as escrow agent;" and Altman and Grabowski represented Thornwater, their shareholders, and their investors in connection with a 2003 transaction wherein Sky Capital agreed to acquire Thornwater assets in exchange for cash and shares in Sky Capital Holdings. *Id.* ¶¶ 2, 5, 9.

Knox's testimony would not have been "inherently in conflict with or not undertaken due to [Hoffman's] other loyalties or interests." *Williams*, 372 F.3d at 106. His testimony would have been redundant. A large part of Knox's peripheral information about Altman was already in the trial record and cannot reasonably be said to have been the subject of any real dispute. How, then, would Hoffman have been protecting Altman by not calling Knox? Mandell offers no plausible explanation. He also does not provide any information about why Hoffman would have had a conflict in calling any other witness. In fact, Mandell does not explain what the other witnesses would have testified to, other than suggesting John Morris could have testified about the propriety of crossing stocks, *see* Reply at 30, which is unrelated to Altman.

Consequently, Mandell has failed to establish a plausible claim of a lapse in representation with respect to any uncalled witness.

### D.     Hoffman Does Not Call Mandell at Trial

As with the uncalled witnesses, Mandell does not explain how his own testimony would have been problematic for Hoffman in light of his supposed conflict of interest. The "facts" relating to Altman that Mandell asserts he told Hoffman about and could have revealed to the jury include ZZA's 9.9% ownership in the General Partner of Thornwater; Altman and ZZA's role as escrow agent for Thornwater private placements and counsel to Thornwater and the

Thornwater holding companies; Altman and ZZA's roles as "architects" of Thornwater private placements; Altman and ZZA's ownership of shares in Thornwater deals; and Altman and ZZA's ability to exert control and influence over Grabowski. *See* Mandell Aff. ¶¶ 2–5; Reply at 25–26.

As an initial matter, the Court has serious doubts about this argument. First of all, most of this is not new. Next, the argument is internally contradictory to Mandell's other arguments. How could Mandell testify negatively about Altman in light of his argument that he wanted Altman to corroborate his testimony? Regardless, the substance of what Mandell contends he told Hoffman he could have said about Altman is insufficient to establish that his testifying would have been "in conflict with or not undertaken due to [Hoffman's] other loyalties or interests." *Williams*, 372 F.3d at 106. Mandell's hypothetical testimony about Altman and ZZA does not present an issue of divided loyalties. This includes Mandell's vague assertion that Altman and ZZA could exert control and influence over Grabowski, as Mandell does not claim that Altman ever did so or what happened as a result. Moreover, the underlying record shows that Hoffman did not seek to avoid eliciting incriminating testimony about Altman; instead, he questioned witnesses about whether they committed crimes with Altman. *See* Trial Tr. 565–66, 2641–42. There is thus no plausible basis to conclude that Hoffman did not call Mandell to prevent him from testifying about Altman.

Furthermore, it was Mandell's choice not to testify. *See Brown v. Artuz*, 124 F.3d 73, 78 (2d Cir. 1997) ("[T]he decision whether to testify belongs to the defendant and may not be made for him by defense counsel."). Mandell argues only that Hoffman "bullied" him out of testifying (without providing any explanation of what this means). *See, e.g.*, Mandell Aff. ¶¶ 17, 20, 21. It appears clear that Mandell, not Hoffman, made the decision not to testify. *See* Petition at 13 ("Hoffman insisted on resting the Defense Case after . . . urging Defendant not to testify . . . .").

And Hoffman credibly details the reason Mandell chose not to testify. Hoffman Aff. ¶ 8. Because there is nothing suggesting that Mandell did not knowingly choose not to testify, it stands to reason that his testifying was not a "plausible alternative defense strategy or tactic [that Hoffman] might have . . . pursued." *See Williams*, 372 F.3d at 106.

### E. Hoffman Does Not Allow Mandell to Meet with the Government, Proffer, Plea Bargain, or Cooperate

Mandell does not establish a plausible claim that he was not permitted to meet with the government, proffer, plea bargain, or cooperate as a result of Hoffman's purported conflict. Instead, Mandell's affidavit belies the notion that Mandell would have pleaded guilty, and consequently, that he would have been able to cooperate. Mandell states: "*Had I been faced with actual evidence of wrongdoing* I would have plead to a deal." Mandell Aff. ¶ 23 (emphasis added).

It is clear, however, that Mandell would never have considered his precondition to pleading guilty—that he be "faced with actual evidence of wrongdoing"—satisfied. Even after a trial where overwhelming evidence of his guilt was introduced, Mandell still maintains his innocence. *See e.g.*, Mandell Aff. ¶ 17 ("I have no doubt the jury would have acquitted me had I been given the right to confront my accusers in court."); Mandell Sentencing Tr. 40 ("[T]he people that cooperated here, they perjured themselves in front of you. They lied."); *Id.* 45 (stating that witnesses "lied and lied" at trial). That Mandell would not have pleaded guilty is corroborated by Hoffman, who states that he "do[es] not recall any conversations in which Mr. Mandell expressed interest in pleading guilty. He desired to proceed to trial and believed that he would be found not guilty." Hoffman Aff. ¶ 5. Mandell's limitation on the circumstances under which he would have pleaded guilty and his continued insistence on his innocence "negate the notion that [pleading guilty] was a plausible alternative under the adverse effects standard." *See*

*Armienti v. United States*, 313 F.3d 807, 815 (2d Cir. 2002); *see also Pepe v. Walsh*, 542 F. App'x 54, 56 (2d Cir. 2013) (summary order) ("[I]t is by no means clear that Pepe would have accepted a pre-indictment plea bargain if one had been offered, given his repeated claims of innocence and eventual decision to go to trial.").

Cooperation therefore would also have been precluded as a plausible alternative. *See* Opp'n at 12 ("Cooperating against Altman would have required Mandell to plead guilty and accept responsibility for his own involvement in this scheme and any other criminal conduct in which Mandell had ever engaged . . . ."); *see also* Hoffman Aff. ¶ 5 ("I am also familiar with the practices of the United States Attorney's Office for the Southern District of New York, and I understand that their office policy is to require any potential cooperators to admit their involvement in all criminal conduct."). Even if Mandell could have cooperated without pleading guilty (not a possibility), Mandell still fails to explain how cooperating would have been "in conflict with or not undertaken due to [Hoffman's] other loyalties or interests." *Williams*, 372 F.3d at 106. There is nothing (other than Mandell's unsupported speculation) suggesting that Hoffman was even aware, prior to trial, that the government was interested in Altman. Nor, as discussed above, would the information Mandell provided Hoffman about Altman present a problem of divided loyalties. And the Court cannot see anything about the information Mandell suggests he could have provided that could qualify as substantial assistance. As a result, offering to cooperate was not a plausible alternative defense strategy, nor was it in conflict with Hoffman's loyalties or interests.

For the same reasons that cooperating did not present a problem of divided loyalties, proffering similarly did not implicate any divided loyalties. Furthermore, nothing Mandell claims he would have told the government suggests that he could have persuaded the government

not to prosecute. With no real possibility that Mandell would have entered into a plea deal,[6] the Court cannot see how proffering would have made any defensive sense, especially where it could have opened Mandell to further criminal exposure.

Mandell also argues that Hoffman did not allow him to meet with the Government "to discuss their concerns regarding Defendant and Sky Capital," Petition at 6, "to try and work out an agreeable solution," *id.* at 10, or to "come to terms with the government," *id.* To the extent these arguments imply some course of action other than pleading guilty, cooperating, or proffering, Mandell does not explain how these so-called defense strategies had any viability. Consequently Mandell does not plausibly establish any lapse in representation.

## IV. Potential Conflict of Interest

Assuming that Hoffman had a potential conflict of interest that Mandell did not waive, Mandell still fails to establish that Hoffman's decisions, either standing alone or taken together, were unreasonable and prejudiced Mandell.

### A. Hoffman Does not Cross-Examine Witnesses About Altman's Role in the Scheme, and Hoffman Does Not Call Altman or Other Witnesses at Trial

As described above, the testimony that Mandell suggests Hoffman could have elicited from witnesses about Altman's role in the scheme would not have been helpful to Mandell's defense against the government's case; it had no reasonable probability of changing the outcome of the trial. Similarly, any testimony that Altman might have provided had no reasonable probability of impacting the jury's decision, especially given how little credibility he would have had: the evidence at trial was that Altman committed crimes, including suborning perjury, in

---

[6] Mandell argues that he would have proffered prior to his indictment but that Hoffman did not advise him to do so due to his conflict. Reply at 22. But "[t]he Sixth Amendment right of the 'accused' to assistance of counsel in 'all criminal prosecutions' is limited by its terms: it does not attach until a prosecution is commenced." *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 198 (2008) (internal quotation marks omitted).

connection with the scheme; and the government could have vigorously cross-examined Altman on the SEC's decision barring him from practicing or appearing before it, *see* Opp'n at 15.

Beyond his potential testimony about Altman, Knox's affidavit suggests that he would have testified that Mandell was upstanding and did not engage in wrongdoing or criminal activity, despite the fact that Knox lost upwards of $500,000. But one investor not having a negative experience with Mandell and his companies had no reasonable probability of negating the substantial evidence introduced at trial of wrongful conduct directed at many other investors. And Mandell's contention that Morris would have testified about the propriety of crossing stocks—a contention that is unsupported by any affidavit—does not suggest that there was any reasonable probability that the jury's verdict would have been different. As the government explained in its summations at trial, the propriety of crossing stocks was not in itself problematic; the problem was what investors understood the market for Sky Capital stock to be, when in reality the market was illusory. *See, e.g.*, Trial Tr. 3476, 3780–81. Other than Knox and Morris, Mandell provides no indication of what other uncalled witnesses might have testified to.

Mandell has thus failed to plausibly establish a reasonable probability that the jury's verdict would have been different had Hoffman cross-examined witnesses more vigorously about Altman's role, or had Hoffman called Altman, Knox, Morris, or any other witness at trial.

### B. Hoffman Does Not Allow Mandell to Meet with the Government, Proffer, Plea Bargain, or Cooperate

There is no reasonable probability that Mandell would have pleaded guilty or cooperated: Mandell states that he would have required evidence of his guilt, and notwithstanding the abundant evidence of guilt, he still maintains his innocence. Moreover, nothing about the information Mandell contends he could have provided (that he did not do it; the other guy did) suggests it would have qualified as substantial assistance. And Mandell has not plausibly

established that had he proffered, there is a reasonable probability that the outcome would have been any different.  In fact, Mandell states that Harrington proffered, *see* Reply at 17, but Harrington still was tried and convicted of all charges against him.  It is also not unreasonable for an attorney to recommend that a client not proffer or cooperate where proffering or cooperating might expose the client to additional criminal liability, the information had no plausible chance of persuading the government not to prosecute or to provide a 5K1 letter, and the defendant has no interest in pleading guilty.  Finally, with respect to Mandell's assertion that Hoffman prevented him from meeting with the government, Mandell does not explain how doing so outside the context of proffering, pleading guilty, or cooperating, would have had any reasonable probability of changing the outcome of the proceeding.

## C. Hoffman Does Not Call Mandell at Trial

Mandell's assertion of ineffective assistance of counsel based on Hoffman's alleged failure to call him as a witness fails *Strickland*'s first test.  While Mandell claims that Hoffman "bullied" him out of testifying, *e.g.*, Mandell Aff. ¶¶ 17, 20, 21, there is no allegation that Mandell was unaware of his right to testify.  *See Chang v. United States*, 250 F.3d 79, 84 (2d Cir. 2001) ("As we stated in *Brown* [*v. Artuz*, 124 F.3d 73 (2d Cir. 1997)], the 'burden of ensuring that the defendant is informed . . . of the right to testify . . . is a component of the effective assistance of counsel.'"); Petition at 13 ("Hoffman insisted on resting the Defense Case after . . . urging Defendant not to testify . . . .").  And Mandell does not provide any specifics of how Hoffman was supposedly able to bully him out of testifying.  His claim is therefore "highly self-serving and improbable."  *Id.* at 86.  Instead, the Court finds credible Hoffman's explanation of why Mandell did not testify.  Hoffman states:

> I ultimately advised [Mandell] not to testify.  I explained that Mr.
> Mandell would be required to essentially say that the Government's

> four cooperating witnesses all gave false testimony. Mr. Mandell
> would also be cross-examined by the Government and confronted
> with recorded phone conversations demonstrating his knowledge of
> the fraudulent scheme. When I practiced cross-examining Mr.
> Mandell, I did not think that the jury would find his responses to be
> credible. Mr. Mandell agreed with my assessment and chose not to
> testify.

Hoffman Aff. ¶ 8. Consequently, Mandell's claim lacks merit. "[A] hearing would not offer any

reasonable chance of altering [the Court's] view of the facts," and so is unnecessary. *See Chang*,

250 F.3d at 85–86 ("[A] detailed affidavit from trial counsel credibly describing the

circumstances concerning appellant's failure to testify . . . was sufficient to support dismissal of

the petition.").

　　　Furthermore, there is no reasonable probability that Mandell's proposed testimony would

have resulted in a different outcome. As discussed, Mandell's allegations about Altman's role

are peripheral and in any event consistent with the evidence at trial. Mandell contends that he

could have additionally testified about: the risk factors identified in the offering documents

provided to investors, who were all sophisticated; the liquidity events on the horizon; the

circumstances around Mandell's departure from Thornwater; how Mandell started Sky Capital;

UK requirements and laws for marketing and underwriting IPO stock, and trading shares on the

AIM; the propriety of crossing stocks; a recording where Mandell discussed the low likelihood

of a private placement successfully completing an IPO; and Mandell's ownership of Sky Capital

stock. *See* Reply, 27–36.

　　　But Hoffman was able to get much of this before the jury during direct, cross, and

summations, and the jury rejected it as a viable defense. *See, e.g.*, Trial Tr. 1641, 1643, 3627

(private placement memoranda explained risks); Trial Tr. 3674, 3677–78 (investors were

sophisticated); Trial Tr. 3094–95; 3739–40 (cross trading is proper); Trial Tr. 3637–40

(recording about success rates for IPOs taken out of context); Trial Tr. 3757–58 (Mandell owned millions of Sky Capital shares). The government also had responses to many of Mandell's proposed arguments. *See, e.g.*, Trial Tr. 855–56 (investor told disclosures in offerings were boilerplate and "not to worry about it"); Trial Tr. 3476, 3780–81 (problem with cross trading not legality but what investors understood value of Sky Capital stock to be); Trial Tr. 3802 (Mandell did not sell his Sky Capital stock because it would hurt the company, which was his "cash cow"). The Court concludes Mandell has failed to plausibly establish a substantial likelihood that his proposed testimony would have changed the outcome of the trial in light of (1) the overwhelming evidence of his guilt; (2) the jury's rejection of many of Mandell's arguments; (3) the government's ready responses to substantial portions of Mandell's proposed testimony; and (4) the fact that Mandell would have been open to cross-examination by the government.

## CONCLUSION

Mandell fails to establish a plausible claim of ineffective assistance of counsel based on Hoffman's purported actual or potential conflict of interest, or Hoffman's supposed failure to file an interlocutory appeal. His Petition is denied in all respects, and no hearing is necessary. Because Mandell has not "made a substantial showing of the denial of a constitutional right," a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of Court is directed to terminate the motion pending at docket number 317 in Case No. 09 Cr. 662, and to close Case No. 16 Civ. 1186.

Dated: New York, New York
      May 23, 2017

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge

Copy mailed by Chambers to:

27

Ross H. Mandell
62590-054
Federal Corrections Institution Miami
15801 SW 137th Ave.
Miami, FL 33177